FILED

May 10 2016

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 15-0400

DA 15-0400

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2016 MT 103

LINDSEY MOE,

        Plaintiff and Appellant,

    v.

BUTTE-SILVER BOW COUNTY,

        Defendant, Cross-Appellant and Appellee.

APPEAL FROM:    District Court of the Second Judicial District,
In and For the County of Butte-Silver Bow, Cause No. DV 2013-354
Honorable Ray Dayton, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

            Frederick F. Sherwood, Morrison, Sherwood, Wilson & Deola PLLP,
Helena, Montana

        For Appellee:

            Cynthia L. Walker, Emma R. Armstrong-Blanchard, Poore, Roth &
Robinson, P.C., Butte, Montana

        Submitted on Briefs:  March 16, 2016

                 Decided:  May 10, 2016

Filed:

                        Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1    Lindsey Moe appeals an order of the Second Judicial District Court, Silver Bow County, granting partial summary judgment in favor of Butte-Silver Bow County (County). The County cross-appeals the District Court's partial denial of its summary judgment motion.

¶2    We restate the issues as follows:

*1. Whether the County is entitled to summary judgment on Moe's claim that it violated Montana's open meeting laws.*

*2. Whether the County is entitled to summary judgment on Moe's claim that it violated Montana's public participation laws.*

*3. Whether the District Court erred in granting summary judgment in the County's favor with respect to Moe's 42 U.S.C. § 1983 claim.*

*4. Whether the District Court erred in ruling as a matter of law that the County did not discharge Moe in violation of its own policies or for refusing to violate public policy.*

*5. Whether the District Court correctly concluded that Moe is entitled to a trial on her claim that the County terminated her employment without good cause.*

¶3    We affirm on all issues.

## PROCEDURAL AND FACTUAL BACKGROUND

¶4    Moe was appointed as the human resources director for the County beginning in 2009. In early 2013, employees complained to the County Chief Executive Matt Vincent regarding Moe's job performance and behavior. Vincent and the County Attorney, Eileen Joyce, met with Moe in February 2013 to informally counsel Moe regarding her performance issues.

¶5 In April 2013, Vincent learned that Moe had failed to disclose to him her knowledge of potential wage claims against the County.[1] During that same month, one of Moe's subordinates filed a productive work environment/workplace harassment complaint against Moe. As a result, Vincent placed Moe on administrative leave in May 2013, pending the outcome of an investigation by an independent consultant. During the investigation Moe was represented by counsel, participated in meetings with Vincent, and provided written responses to the issues being investigated.

¶6 The investigation established that the productive work environment/workplace harassment complaint was unsubstantiated. The investigation revealed, however, that other issues were substantiated relating to Moe's inappropriate conduct and job performance deficiencies.

¶7 Pursuant to the County Charter, the Chief Executive has the power to remove a non-elected department head for just cause with advice and consent of the Council of Commissioners (Council). Following the investigation, Vincent determined that Moe should be terminated and requested a special meeting of the Council to obtain its advice and consent for the termination. Moe was provided with the written documents and reasons for her termination. Vincent met with Moe and her attorney in order to give Moe an opportunity to provide any additional information or documents in response to the

---

[1] The potential wage claims arose from provisions in the County's employee compensation plans derived from a classification and compensation study by Fox Lawson and Associates, a Minnesota-based compensation consulting firm. The parties refer to the plan as the "Fox Lawson Pay Plan" and we will do the same.

investigation results. The Council was given the investigative report, along with the documents Moe submitted in response, for review in advance of the meeting.

¶8 Prior to the meeting, Vincent announced his intention to close the portion of the meeting concerning the reasons for his decision to terminate Moe. Joyce informed Moe that the meeting would be closed and that Moe would not be allowed to speak at the meeting. In response, Moe waived her right of privacy and requested that the meeting remain open.

¶9 At the beginning of the meeting on October 16, 2013, Vincent, as the presiding officer, declared that he was closing the meeting based on his determination that the privacy rights of County employees, including the employee who had made the workplace harassment complaint and the employees who provided information during the investigation, outweighed the merits of public disclosure. Vincent did not identify the employees with the alleged privacy interests or give those employees an opportunity to waive their privacy interests. Moe and her attorney were allowed to remain at the meeting, but were not allowed to speak.

¶10 During the closed portion of the meeting, Vincent and Joyce provided the Council with reasons for Moe's termination. When the meeting was re-opened the Council granted consent to terminate Moe's employment. On October 18, 2013, Vincent sent a termination notice to Moe advising her that she was discharged, and included a copy of the County's grievance policy.

¶11 Moe submitted a grievance with the County on November 4, 2013. On November 15, 2013, Moe filed a complaint alleging three counts against the County: 1) violation of Montana's open meeting laws, Article II, Section 9 of the Montana Constitution and § 2-3-203, MCA; 2) violation of Article II, Section 8 of the Montana Constitution and §§ 2-3-101 through -114, MCA, relating to the right of citizen participation in government operations; and 3) violation of due process and equal protection rights under the Fourteenth Amendment to the United States Constitution, claiming a right to recover damages pursuant to 42 U.S.C. § 1983. In January 2014, the County denied Moe's grievance on the ground that she failed to provide a detailed statement of the disputed issues and relevant facts that explain what specific policies and procedures she alleged were violated and the specific remedy she sought through the grievance process. Moe amended her complaint in March 2014, adding a fourth count: 4) violation of the Montana Wrongful Discharge from Employment Act, §§ 39-2-901 through -915, MCA.

¶12 After the County filed its answer to her amended complaint, Moe moved for partial summary judgment on the issue of liability on all four counts. The County opposed Moe's motion and filed its own motion for summary judgment on all counts. During the January 16, 2015 summary judgment hearing, the County introduced a copy of the independent investigator's fact-finding report relating to Moe's termination. The District Court admitted the report provisionally. After the hearing, the court ordered that the report be filed under seal. On May 27, 2015, the District Court issued an order

granting summary judgment to the County on the first three counts. On the fourth count, the court granted the County's motion with respect to Moe's claim that the County violated § 39-2-904(1)(a) and (c), MCA. The court denied the County's motion with respect to Moe's claim that the County violated § 39-2-904(1)(b), MCA, holding that factual questions remained as to whether the County had good cause for Moe's termination.

¶13 Moe moved for certification of the summary judgment order as final pursuant to M. R. Civ. P. 54(b). The District Court granted Rule 54(b) certification on June 30, 2015. Noting that the County did not oppose Moe's motion for certification, we determined that the District Court's certification order satisfied the requirements of M. R. Civ. P. 54(b) and M. R. App. (6)(6). *Moe v. Butte-Silver Bow Cnty.*, DA 15-0400, Or. (Mont. July 14, 2015). Both parties appeal.

## STANDARDS OF REVIEW

¶14 We review de novo a district court's grant or denial of summary judgment. *Pilgeram v. GreenPoint Mortg. Funding, Inc.*, 2013 MT 354, ¶ 9, 373 Mont. 1, 313 P.3d 839. Summary judgment is appropriate when the moving party demonstrates both the absence of any genuine issues of material fact and entitlement to judgment as a matter of law. M. R. Civ. P. 56(c)(3); *Anderson v. BNSF Ry.*, 2015 MT 240, ¶ 15, 380 Mont. 319, 354 P.3d 1248. Conclusory statements, speculative assertions, and mere denials are insufficient to defeat a motion for summary judgment. *Davis v. State*, 2015 MT 264, ¶ 7, 381 Mont. 59, 357 P.3d 320. All reasonable inferences that may be drawn from the

offered evidence should be drawn in favor of the party opposing summary judgment; however, summary judgment cannot be defeated by unsupported speculation. *Baumgart v. State*, 2014 MT 194, ¶ 14, 376 Mont. 1, 332 P.3d 225. We review a district court's conclusions of law to determine whether they are correct and its findings of fact to determine whether they are clearly erroneous. *Pilgeram*, ¶ 9.

## DISCUSSION

¶15   *1. Whether the County is entitled to summary judgment on Moe's claim that it violated Montana's open meeting laws.*

¶16   Moe claims that the decision to close a portion of the special meeting violated Montana's open meeting laws because the County failed to follow proper procedures in determining whether the alleged privacy interests of the other employees outweighed the merits of public disclosure. Moe argues that the employees who had alleged privacy interests were "not even identified" and that there was "no analysis of what [the] alleged privacy rights were." Moe emphasizes that she had waived her privacy rights and that the other employees were not given the same opportunity. Moe argues that Vincent made a "blanket determination" that simply because other employees were involved "they automatically had privacy interests that prevented any public discussion of any aspect of the investigation." According to Moe, "[s]uch an unprecedented rule would gut the Open Meeting Laws." As a result, Moe contends that the County should have identified the other employees, stated why their privacy rights outweighed the merits of public disclosure, and then given them a chance to waive those privacy rights.

7

¶17 In any event, Moe argues, the other employees' protected privacy interests were not implicated because none of their personnel records were discussed at the meeting. According to Moe, "[a]t most, employee(s) accusations against Moe could have been discussed, and these are not protected by a privacy right except that of [Moe]." In addition, Moe argues that the District Court improperly based its decision on the idea that public disclosure of workplace harassment and retaliation complaints may discourage employees from pursuing such complaints. This idea, according to Moe, is at odds with the law because "the only consideration that can defeat the public's right to know is the other constitutional right of individual privacy." Moe claims that the District Court's holding erroneously makes it so the right to anonymously complain is superior to the constitutional right to know.

¶18 Article II, Section 9 of the Montana Constitution establishes the public right to know:

> No person shall be deprived of the right to examine documents or to observe the deliberations of all public bodies or agencies of state government and its subdivisions, except in cases in which the demand of individual privacy clearly exceeds the merits of public disclosure.

This provision is implemented by §§ 2-3-201 through -221, MCA. Section 2-3-203, MCA, provides, "The presiding officer of any meeting may close the meeting during the time the discussion relates to a matter of individual privacy and then if and only if the presiding officer determines that the demands of individual privacy clearly exceed the merits of public disclosure." Section 2-3-203(3), MCA. The Montana Constitution establishes the right to privacy in Article II, Section 10: "The right of individual privacy

is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest." The competing interests of the right to privacy and the right to know "must be balanced in the context of the facts of each case, to determine whether the demands of individual privacy exceed the merits of public disclosure." *Billings Gazette v. City of Billings*, 2013 MT 334, ¶ 14, 372 Mont. 409, 313 P.3d 129 (citation and internal quotation marks omitted).

¶19　In conducting this balancing test, courts must first consider whether the individual(s) whose privacy rights are at issue has "a subjective or actual expectation of privacy, and if so whether society should recognize that the expectation is reasonable." *Missoula Cnty. Pub. Schs. v. Bitterroot Star*, 2015 MT 95, ¶ 11, 378 Mont. 451, 345 P.3d 1035. "Actual expectation of privacy is necessarily a question of fact that requires a determination of whether the individual whose privacy is at issue had notice of possible disclosure." *Billings Gazette*, ¶ 18. Whether society is willing to recognize a privacy expectation as reasonable is a question of law that requires consideration of "all relevant circumstances, including the nature of the information sought." *Billings Gazette*, ¶¶ 21, 26. It is reasonable for an employee to expect that matters communicated in private by the employee to his or her employer normally would be kept confidential. *Mont. Human Rights Div. v. Billings*, 199 Mont. 434, 442, 649 P.2d 1283, 1287-88 (1982). Public disclosure of certain employee information "could impede candid communication between employer and employee." *Billings Gazette*, ¶ 26.

¶20 The District Court concluded that the employees who initiated the workplace harassment complaints against Moe had individual privacy interests that society is willing to recognize as reasonable. We agree. First, the employees who initiated the complaints against Moe had an actual expectation of privacy. The County's Productive Work Environment/Harassment Prevention Policy (Policy 134) states, "A report filed under this Policy, its investigation, the outcome of the investigation, and any action(s) taken relating to a specific employee or employees is confidential." Thus, the employees who initiated the complaints against Moe and cooperated in the investigation did not have "notice of possible disclosure" and therefore had an actual expectation of privacy based on Policy 134. *Billings Gazette*, ¶ 18.

¶21 In addition, the County employees' actual expectations of privacy are ones that society is willing to recognize as reasonable. The District Court determined that public disclosure of workplace harassment and retaliation complaints may discourage employees from pursuing such complaints. This determination is consistent with our recognition of such privacy interests and our conclusions that society is willing to recognize those privacy interests as reasonable. In *Montana Human Rights Division*, we held that employees had a reasonable expectation that information contained in their employment records would not be divulged "in an investigation or during a public hearing in which the employee is only remotely involved." *Mont. Human Rights Div.*, 199 Mont. at 443, 649 P.2d at 1288. In *Billings Gazette*, we undertook a lengthy review of our prior decisions relating to the reasonableness of public employees' expectations of

10

privacy when balanced against the public's right know. *Billings Gazette*, ¶¶ 23-40. We observed that employees reasonably would expect that their communications to the employer regarding workplace misconduct "normally would be kept confidential." *Billings Gazette*, ¶ 47 (quoting *Mont. Human Rights Div.*, 199 Mont. at 442, 649 P.2d at 1288) (internal quotation marks omitted). *See also Bozeman Daily Chronicle v. Police Dep't*, 260 Mont. 218, 228, 859 P.2d 435, 441 (1993) (holding that an accuser and witnesses to an alleged incident have a subjective privacy interest which society is willing to recognize as reasonable in an investigation focused on the accused). Here, because the evidence supporting Vincent's decision to terminate Moe was based in significant part on information that had come from other County employees who were only "remotely involved" in the reason for convening the October 16, 2013 Council meeting, those employees had a reasonable expectation that their communications would not be made public. *Mont. Human Rights Div.*, 199 Mont. at 443, 649 P.2d at 1288.

¶22 Having found that the employees had reasonable expectations of privacy, we must balance the employees' right to privacy against the merits of public disclosure. Moe argues that the public is entitled to know why Vincent and Joyce believed that Moe was inadequate in her working relationship with Vincent, and that the public has an interest in "discussion about the Fox Lawson [P]ay [P]lan study and a possible lawsuit that could have arisen from it."

¶23 Moe's arguments are unpersuasive. In *Billings Gazette*, the newspaper sought disclosure of documents detailing the investigation and discipline of Billings City

11

employees due to inappropriate computer usage. *Billings Gazette*, ¶ 1. We concluded that the employees' "reasonable expectation of privacy in their identities with regards to internal disciplinary proceedings clearly outweighs the merits of public disclosure," and that although the information "may make interesting or sensational news copy," "public disclosure is not in the public interest." *Billings Gazette*, ¶ 59. We noted that "[p]ublic knowledge of the names of the individuals disciplined will not provide the public with any greater opportunity to participate in the internal employment decisions of the City." *Billings Gazette*, ¶ 56.

¶24 For similar reasons, we conclude that the privacy interests of County employees with regard to the internal complaint reporting and investigation in this case outweigh the merits of public disclosure. The public, via news reporting outlets, already had received information regarding Moe's administrative leave and pending investigation. Contrary to Moe's contention, the Council meeting did not involve discussion of the substance of the Fox Lawson Pay Plan or potential litigation. Rather, the closed portion of the meeting concerned Vincent's reasons for terminating Moe, based in part on information that employees provided during an investigation that they had been led to believe was confidential. We have observed that "general assertions that public disclosure will foster public confidence in public institutions and maintain accountability for public officers are not sufficient to establish a strong public interest." *Billings Gazette*, ¶ 56 (citing *Missoulian v. Bd. of Regents of Higher Educ.*, 207 Mont. 513, 532, 675 P.2d 962, 972 (1984)). The portion of the meeting during which the Council voted to give consent to

12

Vincent's termination decision was open to the public. Public knowledge of the information gathered from other County employees during a personnel investigation would undermine the County's interest as an employer in encouraging candor and willingness of its employees to bring legitimate complaints to the County's Chief Executive. As we recognized in *Missoulian* and *Mont. Human Rights Div.*, the promotion of candid communication between an employer and its employees is good public policy. *Missoulian*, 207 Mont. at 533, 675 P.2d at 973; *Mont. Human Rights Div.*, 199 Mont. at 442-43, 649 P.2d at 1287-88. Protecting the confidentiality of such communications helps to encourage employees not to remain silent during internal investigations of workplace problems.

¶25 Further, the termination decision was premised in large part upon a multi-faceted investigation comprising interviews with numerous County employees other than Moe. The Council was provided with the investigation report, documenting workplace issues involving employees of Moe's department and other County employees; that report and Moe's responses to its findings were to be discussed at the meeting. The report disclosed the identity of the employees interviewed, which would be evident in any discussion about the issues. Therefore, it was not inappropriate for Vincent to close that discussion to the public rather than to require him to repeatedly open and close the meeting as particular elements of the investigation may have come up during the discussion. We conclude that the District Court did not err in granting summary judgment in the

13

County's favor with respect to Moe's claim that the County violated Montana's open meeting laws.

¶26   2. *Whether the County is entitled to summary judgment on Moe's claim that it violated Montana's public participation laws.*

¶27   Section 2-3-103, MCA, provides that "[e]ach agency shall develop procedures for permitting and encouraging the public to participate in agency decisions that are of significant interest to the public." Section 2-3-103(1)(a), MCA. Before an agency takes final action on an issue that is of significant interest to the public, the agency must follow procedures to ensure adequate notice and assist public participation. Section 2-3-103(1)(a), MCA. "Procedures for assisting public participation must include a method of affording interested persons reasonable opportunity to submit data, views, or arguments, orally or in written form, prior to making a final decision that is of significant interest to the public." Section 2-3-111(1), MCA.

¶28   In *Jones v. County of Missoula*, 2006 MT 2, 330 Mont. 205, 127 P.3d 406, we adopted the Attorney General's definition of the term "significant public interest" as "any non-ministerial decision or action of a county commission which has meaning to or affects a portion of the community." *Jones*, ¶ 16 (citation and internal quotation marks omitted). A ministerial act is one "performed pursuant to legal authority, and requiring no exercise of judgment." *Jones*, ¶ 16. Public participation procedures are required when a final decision is made. Sections 2-3-103, -111, MCA. *See Jones*, ¶¶ 9, 22 (holding that a county commission meeting where the county made the decision to allow dependent coverage to domestic partners of county employees was of significant public

14

interest). Non-ministerial decisions that directly affect more than one person may be considered of significant public interest. *Jones*, ¶¶ 18, 22 (holding that a county's decision to make dependent health care coverage available to domestic partners was of significant public interest even though it affected only county employees).

¶29 In *Jones*, we also acknowledged that the topic at issue was of interest to the public at large because of state and nation-wide media coverage relating to gay and lesbian rights. *Jones*, ¶ 19. We noted that the hearing on proposed legislation that included a provision for extending group insurance to domestic partners of state employees in civil unions "brought hundreds of opponents to the Capitol." *Jones*, ¶ 21 (citation and internal quotation marks omitted).

¶30 Moe argues that her termination was of significant interest to the Butte public. Moe points to newspaper articles concerning her termination to "show the degree of public interest in [the] matter." As such, Moe contends that the County was required under §§ 2-3-103 and -111, MCA, to open the special meeting so that any member of the public could have the opportunity to give input to the Council. Moe points out that "[t]he right of public participation is available to all citizens, and not only to those who may be the subject of the decision in question." Moe acknowledges that if the discussion veered into an area where the right of privacy outweighed the merits of public disclosure, then that portion could have been closed to the public.

¶31 The County argues that it did not violate Montana's public participation laws in relation to Moe's termination because the Council's decision to give advice and consent

to Vincent only affected Vincent's ability to fulfill the County Charter's requirement to obtain advice and consent for his decision. The County argues that the advice and consent of the Council is not part of an employee's pre-termination due process, which concludes with the Chief Executive's termination decision. According to the County, employees are not afforded hearings to plead their case before the Council because an advice and consent meeting is "merely a mechanism for the Council to confirm that the Chief Executive followed the proper process in making his/her decision to appoint or terminate a non-elected department head." Therefore, according to the County, the Council's decision is not a matter of significant interest to the public requiring public participation because "it does not have meaning to or affect a portion of the community."

¶32 The District Court concluded that while the special meeting was non-ministerial, the Council's actions did not significantly affect the community as whole because its decision to give advice and consent affected Vincent's ability to terminate Moe "and nothing more." The District Court determined that the only direct impact of the Council's decision was on Vincent and Moe. The court noted that although the public was not afforded the right to participate in this matter, Moe was given "ample opportunity" prior to the meeting to participate in the investigation process.

¶33 We agree with the District Court. The special meeting was not "of significant interest to the public," § 2-3-103(1)(a), MCA, because it did not have "meaning to or affect[] a portion of the community," *Jones*, ¶ 16. As the County's Chief Executive, Vincent had the authority, pursuant to the County Charter, to terminate a non-elected

16

department head after the conclusion of the pre-termination process. During the pre-termination process, Moe had the opportunity to present evidence to Vincent and meet with him. The Council's special meeting confirmed that Vincent followed the proper steps, and it consented to his termination decision. Unlike *Jones*, the Council's decision did not directly affect anyone except Moe and Vincent. While news media reported Moe's termination, such coverage does not establish by itself that the closed portion of the special meeting was of significant interest to the public. The meeting involved a personnel decision affecting one County employee, and it was not the Council's function at that meeting to determine whether Moe would be discharged. Moreover, Moe's assertion that that she lacked the opportunity to participate in her pre-termination processes is without merit. The record makes clear that Moe actively participated in responding to the fact-finding investigation and provided her own arguments and evidence in rebuttal. Accordingly, the District Court correctly concluded that the County did not violate Montana's public participation laws.

¶34 *3. Whether the District Court erred in granting summary judgment in the County's favor with respect to Moe's 42 U.S.C. § 1983 claim.*

¶35 Moe argues that the County violated her due process rights under 42 U.S.C. § 1983 because she was not allowed to present her own evidence and arguments to the Council during the special meeting and was denied the opportunity to rebut all evidence and arguments that were made to the Council to justify her termination. Moe further contends that the Council was given an "erroneous impression" as to what its role should be because, according to Moe, it was told that it "had no independent obligation to

17

determine if it should give its advice and consent that [she] should be removed for just cause, contrary to the plain language of [Art. IV, Section 4.02(d) of the County Charter]."

¶36    The County argues that Moe confuses the advice and consent process under the County Charter with the due process requirements for the Chief Executive's termination decision. According to the County, Vincent afforded Moe extensive pre-termination processes. The County argues that Moe was not entitled to address the Council because it was not making the decision whether she should be terminated but rather "was simply asked to confirm" Vincent's decision.

¶37    The District Court concluded that Moe had a protected property interest in her continued employment based on Art. IV, Section 4.02 of the County Charter, which provides that the Chief Executive cannot terminate a non-elected department head until the Chief Executive has demonstrated good cause for doing so. The court concluded, however, that the County did not deprive Moe of her pre-termination due process rights. The District Court found that Moe fully participated in the pre-termination investigation, based on the following undisputed facts: Moe provided written and verbal responses to Vincent concerning her alleged policy violations and performance deficiencies; Moe received the independent investigator's report and submitted a multiple-page written response; Moe received a detailed explanation of the policy violations and substantiated performance deficiencies; and Moe met with Vincent to provide him with any additional verbal and written information he should take into consideration before making a final decision.

18

¶38    Title 42, United States Code Section 1983 provides a cause of action for persons deprived of constitutional rights by another person acting under color of state law. *Mysse v. Martens*, 279 Mont. 253, 260, 926 P.2d 765, 769 (1996). Persons who have been deprived of due process by government agents in the termination of employment may be entitled to relief under 42 U.S.C. § 1983 if they have a property interest in their employment. *Hunter v. City of Great Falls*, 2002 MT 331, ¶ 23, 313 Mont. 231, 61 P.3d 764.

¶39    We have held that when a government employer has, by administrative regulation, limited its ability to terminate an employee without just cause, employees subject to that scheme have a property interest in their continued employment, which is protected by due process. *Boreen v. Christensen*, 267 Mont. 405, 416, 884 P.2d 761, 767 (1994). In this context, due process requires "oral or written notice to the employee with an explanation of the employer's evidence and the opportunity for the employee to respond in 'something less' than a full evidentiary hearing *before* termination coupled with a full post-termination hearing 'at a meaningful time.'" *Boreen*, 267 Mont. at 410, 884 P.2d at 764 (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545, 105 S. Ct. 1487, 1496 (1985)) (emphasis in original). "[T]he pretermination hearing need not definitively resolve the propriety of the discharge. It should be an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that charges against the employee are true and support the proposed action."

*Boreen*, 267 Mont. at 410-11, 884 P.2d at 764 (citing *Loudermill*, 470 U.S. at 545-46, 105 S. Ct. at 1496).

¶40 Our review of the record convinces us that the District Court correctly applied the law in ruling that Moe's due process rights were protected. We agree that, pursuant to Art. IV, Section 4.02 of the County Charter, Moe had a protected property interest in her continued employment. That right, however, was not absolute and Moe could be terminated for good cause with due process and with the Council's advice and consent. Moe does not contend that her post-termination due process rights were violated. As the decision to terminate is vested in the Chief Executive, due process did not require that Moe's pre-termination opportunity to respond occur in the Council meeting. Moe's assertion that the Council was "misinformed" as to what "advice and consent" actually meant is without merit. Art. IV, Section 4.02(d) does not impose an "independent obligation" on the Council to determine whether termination was proper. Moe provides no other relevant evidence or authority to support her contention.

¶41 As the District Court noted, the undisputed facts establish that Moe fully participated in the pre-termination process. The opportunities afforded Moe to participate in the pre-termination process, of which she fully availed herself, meet the required due process standard. Moe received a copy of the independent investigator's report, she responded to the report, and she and her attorney met with Vincent on September 18, 2013, to present her arguments as to whether there were "reasonable grounds to believe that charges against her [were] true and support[ed] the proposed action." *Boreen*, 267

Mont. 405 at 410-11, 884 P.2d at 764. The undisputed facts establish that Moe received "oral or written notice with an explanation of the employer's evidence" and had the opportunity to respond in "something less" than a full evidentiary hearing before her termination. *Boreen*, 267 Mont. at 410, 884 P.2d at 764. Accordingly, the District Court did not err in granting summary judgment in the County's favor with respect to Moe's claim that the County violated 42 U.S.C. § 1983.

¶42    *4. Whether the District Court erred in ruling as a matter of law that the County did not discharge Moe in violation of its own policies or for refusing to violate public policy.*

¶43    Montana's Wrongful Discharge from Employment Act provides that a discharge is wrongful if:

> (a) it was in retaliation for the employee's refusal to violate public policy or for reporting a violation of public policy;
>
> (b) the discharge was not for good cause and the employee had completed the probationary period of employment; or
>
> (c) the employer violated the express provisions of its own written personnel policy.

Section 39-2-904(1), MCA. Moe contends that her discharge was wrongful under all three grounds set forth in § 39-2-904(1), MCA. The District Court granted summary judgment against Moe with respect to her claims under § 39-2-904(1)(a) and (c), MCA. Moe agrees that there are no genuine issues of fact but argues that the court should have granted her—rather than the County—judgment as a matter of law.

¶44    Moe argues that her discharge was wrongful under § 39-2-904(1)(a), MCA, because her termination was "in violation of the Montana Wrongful Discharge and Public

21

Participation laws" and thus in violation of public policy. Moe contends that her discharge was wrongful under § 39-2-904(1)(c), MCA, because the County violated three of its written policies—Article IV, Section 4.02(d)(1) of the County Charter, and two sections of the County's Code of Ethics, entitled "Public participation" and "Open Meetings." As discussed, Art. IV, Section 4.02(d)(1) enables the Chief Executive to remove non-elected department heads for just cause with the advice and consent of the Council. Moe claims that, "as a matter of law," the Council did not "truly" give effective "advice and consent" because its action "was taken in violation of Montana's Open Meeting and Public Participation laws," and because the Council was misinformed as to what "advice and consent" actually meant. Moe contends that the County violated the Code of Ethics provisions based on the same arguments she raises under Issues 1 and 2 above relating to open meetings and public participation.

¶45    In regard to § 39-2-904(1)(a), MCA, the County argues that Moe's contentions are insufficient to form the basis of a claim because Montana's open meeting and public participation laws do not constitute "public policies" as defined under the Wrongful Discharge Act. Concerning § 39-2-904(1)(c), MCA, the County argues that neither the County Charter nor its Code of Ethics ordinances constitute personnel policies under the Wrongful Discharge Act. In any event, according to the County, Moe cannot show that any alleged violations of the County's personnel policies caused her termination. The County claims that in the absence of a causal link between the alleged violations and her termination, Moe's claim fails.

22

¶46  Based on its rejection of Moe's open meeting, public participation, and due process claims, the District Court determined that the County did not wrongfully discharge Moe by virtue of violating either its own personnel policies or public policies.

¶47  With respect to Moe's claims under § 39-2-904(1)(c), MCA, we have determined already that the County did not violate Montana's open meeting or public participation laws and that the County's termination procedures did not violate Moe's rights to due process. Accordingly, her claims that the County violated its Charter or Code of Ethics provisions do not substantiate a claim for wrongful discharge under § 39-2-904(1)(c), MCA. Because Moe's wrongful discharge claim under § 39-2-904(1)(c), MCA, fails, it cannot serve as the basis for her claim that the County violated public policy under § 39-2-904(1)(a), MCA. Moreover, Moe's arguments with respect to § 39-2-904(1)(a), MCA, do not correspond with the language of the statute. Moe argues that her termination was in violation of public policy, but she provides no argument or evidence that her discharge was in "retaliation" for her "refusal to violate public policy" or "for reporting a violation of public policy." Section 39-2-904(1)(a), MCA. We conclude that the District Court was correct in granting summary judgment in favor of the County on this issue.

¶48  *5. Whether the District Court correctly concluded that Moe is entitled to a trial on her claim that the County terminated her employment without good cause.*

¶49  Section 39-2-904(1)(b), MCA, provides that a discharge is wrongful if it is not for good cause. "Good cause" is defined as "reasonable job-related grounds for dismissal based on a failure to satisfactorily perform job duties, disruption of the employer's

23

operation, or other legitimate business reason." Section 39-2-903(5), MCA. A legitimate business reason is one that is "not false, whimsical, arbitrary, or capricious and one that must have some logical relationship to the needs of the business." *Davis*, ¶ 10 (citation omitted). In applying this definition, it is important to take into account the "right of an employer to exercise discretion over who it will employ and keep in employment." *Davis*, ¶ 10 (citation and internal quotation marks omitted).

¶50 Once an employer submits evidence of good cause for discharge, the employee must submit evidence demonstrating either that the reason for the discharge is not "good cause" in and of itself or that the given reason "is a pretext and not the honest reason for the discharge." *Becker v. Rosebud Operating Servs.*, 2008 MT 285, ¶ 24, 345 Mont. 368, 191 P.3d 435 (citation and internal quotation marks omitted). If the undisputed facts show "good cause" for discharge from employment, summary judgment is appropriate. *Davis*, ¶ 14; *Becker*, ¶ 30.

¶51 On cross-appeal, the County argues that the undisputed facts establish that it had good cause to terminate Moe's employment and that we should reverse the District Court's denial of summary judgment and remand for entry of judgment in favor of the County. The County claims that it terminated Moe's employment based on her failure to perform her job duties, disruption of County operations, and "other legitimate business reasons." The County points to employee complaints regarding Moe's job performance and behavior, Moe's unresponsiveness to Vincent's requests for further communication, Moe's failure to inform Vincent of potential wage claims—including one in which Moe

24

stood to gain the most significant financial benefit—and Moe's participation in a conference call in her County office during working hours with an attorney who was representing the employees pursuing potential wage claims against the County. Moe's conduct, according to the County, constituted a violation of the duty of public trust and "undermined [Vincent's] confidence in her ability to faithfully serve as a member of [the County's] management team."

¶52    Moe counters that whether she had satisfactorily performed her job duties "is a factual question that cannot be decided by summary judgment." Moe asserts that her two summary judgment affidavits "aver many discrete facts that are in contradiction to the summary judgment affidavits submitted by [the County]." Moe argues further that her discharge was pretextual because "Vincent wanted to discharge [Moe] in order to discourage any litigation concerning the Fox Lawson compensation plan."

¶53    The District Court concluded that a genuine issue of material fact existed as to "whether Vincent's decision to terminate [Moe's] employment was pretextual and not for good cause." The court explained that Moe and the County had different characterizations of the evidence in regard to a number of Vincent's accusations. The court concluded that "a properly instructed jury could conclude that [Moe] did in fact satisfactorily perform[] her job duties and did not disrupt [County] operations. A jury could also conclude to the contrary."

¶54    Based on our review of the record, we agree with the District Court's conclusion. We recognize that because Moe occupied a managerial position, Vincent had broad

discretion to decide whether to keep Moe in employment. *Baumgart*, ¶ 39, *Sullivan v. Cont'l Constr. of Mont., LLC*, 2013 MT 106, ¶ 18, 370 Mont. 8, 299 P.3d 832. Employers have the broadest discretion when dealing with managerial employees. *Baumgart*, ¶ 39. "We afford employers the greatest discretion where an employee occupies a 'sensitive' managerial position and exercises 'broad discretion' in [her] job duties." *Sullivan*, ¶ 18.

¶55 In *Baumgart*, the Department of Commerce presented direct evidence that Baumgart, the former administrator of the Department's Tourism and Promotion Division failed to appropriately manage her budget for five consecutive years, placing the Division "in the precarious position of having more than $4 million in extremely valuable funds swept out of her budget and into the general fund." *Baumgart*, ¶ 36. We upheld summary judgment in favor of the employer because Baumgart could not "refute the existence of the budget problem or her admissions that she did not understand the Division's budget." *Baumgart*, ¶ 36. Moreover, we concluded that "Baumgart failed to present *any* evidence of other underlying reasons for her termination, aside from her unsupported allegations of political motivation for both the political discrimination and wrongful discharge claims." *Baumgart*, ¶ 37 (emphasis in original).

¶56 In *Sullivan*, Continental Construction terminated Sullivan because it believed that "Sullivan had failed to fulfill the requirements of his managerial position and had failed to act in a trustworthy manner" by "treating employees and subcontractors in a demeaning manner"; "having frequent unexplained absences from work"; "speaking to

26

others in a derogatory manner about customers and employees"; and "behaving in a manner that did not meet the standards of Continental Construction." *Sullivan*, ¶¶ 12, 25. Sullivan argued that he raised genuine issues of material fact to suggest that his employer lacked good cause to terminate his employment. *Sullivan*, ¶ 26. To support this assertion, Sullivan pointed to statements made by other employees who indicated that Sullivan "had not acted inappropriately in their presence." *Sullivan*, ¶ 26. He also argued that he "regularly had invited his employees over to his house for dinner and recently organized a group golf trip for his employees." *Sullivan*, ¶ 26. We concluded that Sullivan failed to present material and substantial evidence to raise a genuine issue of material fact as to whether Continental Construction had good cause to terminate him. We noted,

> The fact that not every Continental Construction employee complained about Sullivan failed to undermine the validity of Continental Construction's conclusion that Sullivan's continued employment could threaten its future viability in Montana. Similarly, the fact that Sullivan apparently treated some employees well does not challenge the validity of the complaints made by other Continental Construction employees.

*Sullivan*, ¶ 27.

¶57 An employer's broad discretion in handling managerial employees is not absolute. In *Guertin v. Moody's Market*, 265 Mont. 61, 874 P.2d 710 (1994), we held that where a managerial employee testified that she was a hardworking and loyal employee and had not received previous complaints from her employer about her management capability, and where she explained why she believed that the reasons given by her employer for her termination were factually incorrect, there was an issue of fact regarding whether she was

27

terminated for good cause. *Guertin*, 265 Mont. at 69, 874 P.2d at 715. In *Howard v. Conlin Furniture No. 2*, 272 Mont. 433, 901 P.2d 116 (1995), Howard's direct supervisor testified regarding several events that demonstrated Howard's unsatisfactory performance of his job duties as a furniture store manager. *Howard*, 272 Mont. at 439-40, 901 P.2d at 120. Howard responded by deposition to the allegations against him, denying each allegation with specific claims and counterclaims. *Howard*, 272 Mont. at 440, 901 P.2d at 120. We concluded that Howard's "claims, denials, and counterclaims raise a factual issue as to whether Howard was terminated for good cause within the meaning of § 39-2-903(5), MCA, of the Wrongful Discharge From Employment Act." *Howard*, 272 Mont. at 440, 901 P.2d at 120. Because of the factual issues raised by Howard's detailed responses, we concluded that "reasonable persons could differ regarding inferences to be drawn from the deposition testimony and exhibits." *Howard*, 272 Mont. at 440, 901 P.2d at 121.

¶58 This case is more akin to *Guertin* and *Howard* than it is to *Baumgart* and *Sullivan*. Moe has raised sufficient factual disputes that would support a conclusion that the reason for her discharge was not "good cause" in and of itself or that the given reason was "a pretext and not the honest reason for the discharge." *Becker*, ¶ 24.

¶59 Similar to *Guertin*, in her response to her termination letter, Moe stated that she "worked hard for [the County] and [had] never before been disciplined." In her response to the fact-finding investigative report, Moe explained why she believed that the reasons given by the County for her termination were incorrect. The majority of the County's

28

allegations against Moe stem from the fact-finding investigative report. Similar to *Howard*, Moe submitted a detailed written response to the report in which she took issue with nearly all of the allegations against her. For example, with respect to the allegations that Moe failed to maintain a close cooperative working relationship with Vincent, Moe disputed that Vincent advised her at the February 8, 2013 meeting that he expected better communication from her. Moe contends that the "only reference to poor communication" during that meeting was in regard to an allegation from a Mr. McCarthy faulting her for a delay in direct deposits. Moe alleges that she "was able to show that the direct deposit problem was not due to [her delay], but because there was a new HR/Payroll system and a payroll clerk had not appropriately filled in an effective entry date field." In addition, while Moe does not dispute that she did not advise Vincent of the potential pay plan litigation between April 15 and April 22, 2013, she maintains that Vincent had knowledge already of the potential liability and that she had kept him informed:

> Vincent was notified immediately upon taking office that the pay plan was and continues to be a liability for [the County]. The concern and awareness of liability was acknowledged by Ms. Joyce who stated in one of our January meetings to Mr. Vincent that "yes the pay plan is another big liability we have but we can talk about that another day, ha ha." All parties were aware that failure to follow the pay plan adopted by the council created the potential for liability. Mr. Amerman and I had several meetings with Mr. Vincent since January up until the time I was placed on leave advising and educating him on the pay plan and discussing our concerns if we do not get this pay plan back on track and moving forward.

¶60     With respect to the allegation that Moe's phone conversation with an attorney during working hours was inappropriate, Moe claims that her staff asked her to speak

29

with the attorney and that she did so for "about two minutes" only "to confirm" that retaliation against staff because of the lawsuit would be illegal. In her response to the investigative report, however, Moe also claims that "[f]or personal business I have a First Amendment right to talk with anyone I want." In light of these somewhat conflicting statements in the record, it is unclear whether Moe's conversation with the attorney was for personal reasons or in her capacity as the County's Human Resources Director. It is clear, however, that Moe disputes the allegation that the conversation was inappropriate. Moe disputes also the allegations that she lacked comprehensive knowledge of public sector practices and procedures regarding the Fox Lawson Pay Plan and that she jeopardized County employment practices and liability insurance by failing to implement required policy changes.

¶61 Unlike *Baumgart*, Moe refutes the existence of persistent problems in her department and never acknowledged a lack of understanding of any job duty or responsibility. Furthermore, where Baumgart failed to correct her mistakes for five consecutive years, Moe alleges that she was terminated before she had time to rectify the mistakes perceived by Vincent. In particular, Moe denies that Vincent gave her a directive at the February 8, 2013 meeting to improve communication. She claims that the specific issues he and Joyce brought up at the February 8, 2013 meeting were not substantiated and that she "was able to rebut all of those allegations." Moe explains that from January up until the time she was placed on leave, she had several meetings with Vincent and Mr. Amerman regarding concerns about the Fox Lawson Pay Plan. Drawing

30

all reasonable inferences in favor of Moe, *Baumgart*, ¶ 14, the first time that she became aware of Vincent's concerns with her communication methods was on April 22, 2013, when Vincent asked Moe about the potential pay plan litigation. Moe was placed on administrative leave on May 3, 2013—less than two weeks later.

¶62 Different from *Sullivan*, where Sullivan relied on vague statements from other employees and immaterial information about his conduct with other employees outside the workplace, Moe has presented exhaustive responses to the allegations against her, including a four-page letter responding to her termination letter and a nine-page written response to the investigative report. The Court's only inquiry in reviewing a summary judgment order is to determine whether the evidence establishes a genuine issue of material fact. M. R. Civ. P. 56(c)(3); *Anderson*, ¶ 15. Moe's responses potentially could be viewed by a jury to "challenge the validity" of the County's conclusion that she undermined Vincent's confidence in her ability to serve as a member of the County's management team. *Sullivan*, ¶ 27.

¶63 In contrast to *Davis*, we are unable to conclude that the facts that are undisputed are sufficient to establish good cause. *Davis*, ¶ 14. We conclude that "reasonable persons could differ regarding inferences to be drawn" from the fact-finding investigative report and Moe's responses to the allegations against her. *Howard*, 272 Mont. at 440, 901 P.2d at 121. The evidence Moe presents to support her disputes of the material facts are more than "conclusory statements, speculative assertions, or mere denials," *Davis*, ¶ 7, and are thus sufficient to defeat the County's motion for summary judgment. In light

31

of these genuine issues of fact, we affirm the District Court's denial of summary judgment to the County.

## CONCLUSION

¶64  For the foregoing reasons we affirm the District Court's grant of summary judgment in the County's favor with respect to Issues 1, 2, 3, and 4.  We affirm the District Court's denial of summary judgment to the County on Issue 5 and remand for further proceedings.


/S/ BETH BAKER

We concur:

/S/ MIKE McGRATH
/S/ MICHAEL E WHEAT
/S/ LAURIE McKINNON
/S/ JIM RICE